UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(WESTERN DIVISION)

C.A. No.:

| | |
|---|---|
| EXCEL DRYER, INC.,<br>    Plaintiff | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| DYSON, INC.,<br>    Defendant | ) |
| | ) |

## <u>VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

This action seeks preliminary and permanent injunctive relief, damages, costs and attorney's fees for intentional, fraudulent and bad faith misrepresentation and literally false comparative advertising in violation of the Lanham Act, 15 U.S.C. §§1125, 1117, M.G.L. 266, §91 and the Massachusetts Business Practices Act, M.G.L. c. 93A. §§2, 11.

The Plaintiff, Excel Dryer, Inc. ("Excel") and the Defendant, Dyson, Inc. ("Dyson") compete directly in the high speed energy efficient hand dryer market. Dyson has commenced a global advertising campaign which is premised on false and disparaging claims concerning Excel's XLERATOR hand dryer ("XLERATOR"). In print advertising, in trade show displays, and on its website, Dyson advises consumers that the XLERATOR produces almost twice as much carbon dioxide ($CO_2$) as Dyson's competing Airblade hand dryer ("Airblade"), is worse for the environment than the Airblade, and costs more to run than the Airblade. To convince consumers that its advertising claims are supported by real facts and thus should be accepted, Dyson cites to a 2011 study ("the MSL Study"). In 2011, Dyson commissioned the Materials Systems Laboratory at the Massachusetts Institute of Technology ("MSL") to study, among other things, how much carbon

1

dioxide the Airblade and the XLERATOR generated while drying hands and the impact of the Airblade and the XLERATOR on the environment.

In order to skew the results of the MSL Study in its favor, Dyson provided MSL with false data concerning the XLERATOR's dry time – the amount of time it takes a person to dry his/her hands.  It advised MSL that dry time for the XLERATOR was twenty (20) seconds while the dry time for the Airblade was twelve (12) seconds.  In fact, independent testing performed by SGS North America, Inc. ("SGS"), one of the world's leading inspection, verification, testing and certification companies, has confirmed that residual moisture levels are comparable for the XLERATOR and the Airblade at twelve (12) seconds.  Because they are based on false XLERATOR dry time data which Dyson supplied to MSL, the conclusions of the MSL Study are inaccurate.

Indeed, since learning of SGS's conclusions regarding XLERATOR dry times, the authors of the MSL Study have acknowledged in a signed letter that "[d]rawing a statistically robust conclusion regarding a superior environmental performance in the high speed hand dryer category is not possible".  They have noted that when the twelve second XLERATOR dry time, which SGS independently observed, is substituted for the twenty second XLERATOR dry time, which Dyson supplied, "the Airblade and the XLERATOR are statistically indistinguishable."

Since the amount of $CO_2$ that the Airblade and the XLERATOR generate, the global warming impact of the Airblade and the XLERATOR, and the costs to run the Airblade and the XLERATOR are all functions of their respective dry times, by providing MSL with falsely inflated dry time data for the XLERATOR, Dyson rigged the conclusions of MSL Study in its favor.

Dyson's false and misleading advertising has already caused irreparable harm to Excel's reputation in the high speed energy efficient hand dryer market.  Unless Dyson is immediately

enjoined from further false advertising, Excel will continue to be irreparably harmed.

## PARTIES

1. Excel Dryer, Inc. is a duly organized Massachusetts corporation with a principal place of business at 357 Chestnut Street, East Longmeadow, Massachusetts.

2. Dyson, Inc. is a duly organized Illinois corporation with a principal place of business at 600 West Chicago Avenue, Suite 275, Chicago, Illinois.

3. Dyson is an affiliate of Dyson Group of companies which is based in the United Kingdom.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the action arises under the Lanham Act, 15 U.S.C. §§1051, *et seq.*, and pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and is between citizens of different states.

5. This court has supplemental jurisdiction over Excel's state law claims pursuant to 28 U.S.C. §1367(a).

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) because Dyson "resides" in district within the meaning of 28 U.S.C. §1391(c) insofar as it is subject to personal jurisdiction in this district. Alternatively, venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the actions and/or omissions giving rise to the claims in this action occurred in this district.

7. This court has personal jurisdiction over Dyson pursuant to Mass. Gen., c. 223A, §§3(a), (b), (c), and (d) because this action arises: (a) from Dyson's transaction of business in Massachusetts; (b) from Dyson's contracting to supply services or things in Massachusetts;

(c) from Dyson's causing tortious injury by acts or omissions within Massachusetts; and/or

(d) from Dyson's causing tortious injury by acts or omissions outside of Massachusetts while regularly doing business or soliciting business or engaging in a persistent course of conduct or driving substantial revenue from goods and/or services used or consumed, in Massachusetts.

8.  The particular conduct triggering such jurisdiction includes, among other things: (a) Dyson's operation of the highly interactive website through which it solicits and conducts business, including business in Massachusetts; (b) Dyson's contracting with entities which do business in Massachusetts; and/or (c) Dyson's intentional disparaging reference to Excel and the XLERATOR  in advertising that was intended to cause harm to Excel, a corporation which does business in Massachusetts and is located in Massachusetts.

9.  Through such conduct, Dyson has purposefully availed itself of the privileges of conducting business in the Commonwealth of Massachusetts, and when in engaging in such conduct, should reasonably have perceived that it would be subjected to this court's jurisdiction.

## FACTS

10. For more than 48 years, Excel's full line of hand dryers has provided cost-effective dryers for schools, hospitals, airports, service stations, correctional facilities, restaurants, stadiums, movie theaters, health clubs, office buildings, factories, hotels and many other commercial facilities.

11. Excel pioneered the high speed energy efficient hand dryer and is a leader in the global high speed energy efficient hand dryer market which it created.

12. It markets its high speed energy efficient hand dryers, which are manufactured in East Longmeadow, Massachusetts, under the XLERATOR brand.

13. The XLERATOR uses patented technology to make hand drying fast and efficient.

14. By means of a high-velocity air stream and contoured nozzle, the XLERATOR eliminates water droplets and vapor on hands.

15. Dyson, which is known primarily as a vacuum cleaner company, more recently began manufacturing and marketing a high speed energy efficient hand dryer of its own.

16. Known as the Airblade, Dyson's hand dryer competes directly the XLERATOR in the high speed energy efficient hand dryer market.

17. The list price of the Airblade is approximately two times the list price of the XLERATOR.

18. In 2011, Dyson commissioned MSL to conduct a study comparing the Airblade, the XLERATOR, more conventional air hand dryers, cotton roll towels and paper towels. ("MSL Study).

19. The MSL Study considered the global warming potential of the Airblade and the XLERATOR and the $CO_2$ generated by the Airblade and the XLERATOR.

20. The MSL Study concluded that over "measured dry times" the XLERATOR had a higher global warming potential than the Airblade, generated more $CO_2$ than the Airblade, and consumed more energy than the Airblade.

21. The MSL Study's conclusions regarding the relative global warming potential of the Airblade and the XLERATOR were a direct function of the amount of $CO_2$ generated by each during the course of a hand drying session: The more $CO_2$ generated, the greater the global warming potential.

22. The amount of $CO_2$ generated during hand drying session, in turn, was a direct function of dry times: the longer the dry time, the longer the dryer's motor runs and the more $CO_2$ generated.

23. Similarly, the energy required to run the Airblade and the XLERATOR (their cost to run) was a direct function of dry times: the longer the dry time, the longer the dryer's motor runs and the greater the cost to run.

24. Dyson represented to the authors of the MSL Study that the dry time for the Airblade was twelve seconds and that the dry time for the XLERATOR was twenty seconds.

25. The authors of the MSL Study did not independently verify the Dyson supplied dry times, and on information and belief, assumed that the Airblade and the XLERATOR dry times which Dyson supplied were accurate.

26. The Dyson supplied dry times formed the basis for the conclusions of the MSL Study regarding the Airblade and the XLERATOR's relative global warming potential, $CO_2$ generation, and costs to run.

27. In fact, independent testing performed by SGS ("SGS's Dry Time Testing"), confirms that residual moisture levels after twelve seconds of drying at 120 V, 60 Hz are comparable for the XLERATOR and the Airblade.

28. Not surprisingly, based on the falsely inflated XLERATOR dry time that Dyson supplied to it, MSL produced a study from which one could conclude that the XLERATOR generated more $CO_2$ than the Airblade, cost more to run than the Airblade, and had a higher global warming potential than the Airblade.

29. Because they are based on false XLERATOR dry time data which Dyson supplied to MSL, the conclusions of the MSL Study are inaccurate.

30. Nevertheless, relying on, and citing to, the MSL Study, Dyson created a global advertising campaign which directly compares the XLERATOR to the Airblade.

31. It has run a print advertisement in several magazines and trade journals which depicts the XLERATOR and the Airblade, and which claims that the XLERATOR is "expensive to run" and "worse for the environment" than the Airblade.

32. In that advertisement, it claims that:

> In a recent peer-reviewed study by a leading science and technology university, all other hand dryers studied produced more $CO_2$ than the Dyson Airblade™ hand dryer. The Excel XLERATOR produces almost twice as much.

33. It also claims in that advertisement that the Airblade "costs 46% less to run" and is "best for the environment."

7

34. In a footnote, it suggests that its conclusion that the Airblade costs 46% less to run is based on "12 second dry time for Dyson Airblade$^{TM}$ hand dryer, 20 second for XLERATOR, based on NSF P335 protocol ([www.nsf.org](www.nsf.org))".

35. The advertisement also asserts that:

> The study shows that the Dyson Airblade$^{TM}$ hand dryer (AB04) generates 4.4g of $CO_2$ per dry, almost 50% less than the Excel XLERATOR hand dryer.

36. In addition, in the advertisement, Dyson claims that the Airblade: "dries hands in 12 seconds and costs 46% less to run than the Excel XLERATOR hand dryer."

37. Dyson makes similar assertions regarding the Airblade and the XLERATOR on its website and in displays which it employs in its booths at trade shows and elsewhere.

38. In its trade show display, Dyson presents actual XLERATOR and Airblade hand dryers.

39. Text above the XLERATOR describes it as "Unhygienic", "Energy Hungry" and "Too Slow".

40. The text above the XLERATOR reads "takes up to 43 seconds to dry hands", while the text above the Airblade asserts that it dries hands in 12 seconds.

41. On its website, Dyson asserts that "a recent peer reviewed study by a leading science and technology institute proves that the Dyson Airblade hand dryer (ABS) is better for the environment than any other method of drying hands" and that "[t]he Dyson Airblade hand dryer is the best in all environmental measures, outperforming paper towels, cotton towels, warm air hand dryers and the Excel Xlerator."

42. The claims which Dyson makes in its print advertisement, in its trade show display, and on its website are all based on the results of the MLS Study, which, in turn, are based on the falsely inflated XLERATOR dry times that Dyson supplied to MSL.

43. After the MSL Study was published, the results of SGS's Dry Time Testing of the XLERATOR were supplied to the MSL Study's authors.

44. After reviewing the results of SGS's Dry Time Testing, the authors of the MSL Study advised, in a signed letter, that given the magnitude and variance between the XLERATOR dry times supplied to them by Dyson and the XLERATOR dry times reported by SGS, "[drawing] a statistically robust conclusion regarding a superior environmental performance in the high speed dryer category is not possible."

45. The authors of the MSL Study have noted that when the twelve second XLERATOR dry time (which SGS independently observed) is substituted for the twenty second XLERATOR dry time (which Dyson supplied) "the Airblade and the XLERATOR are statistically indistinguishable."

46. Dyson's misrepresentations, deceptions and product disparagement are aimed at Excel, intended to undercut the integrity of Excel's XLERATOR product, and are intended to give Dyson an unfair advantage in the high speed energy efficient hand dryer marketplace by illegal means.

## CAUSES OF ACTION

## COUNT I – LANHAM ACT FALSE ADVERTISING

47. The Plaintiff repeats and realleges the allegations contained in paragraphs 1-45 of its Complaint and incorporate them herein by reference.

48. Dyson's above-referenced advertising campaign includes false and disparaging claims.

49. Dyson's claims that Excel's XLERATOR hand dryer produced almost twice as much $CO_2$ as the Dyson Airblade and was worse for the environment is literally false and disparaging.

50. In fact, Excel's XLERATOR is substantially at parity with or superior to Dyson's Airblade in terms of $CO_2$ emissions and environmental impact.

51. Dyson's claim that the Dyson Airblade costs 46% less to run than the Excel XLERATOR hand dryer is literally false and disparaging.

52. In fact, the Excel XLERATOR hand dryer is substantially at parity with or superior to Dyson's Airblade in terms of costs to run.

53. Dyson's suggestion that the 20 second dry time for the Excel XLERATOR is based on NSF Protocol 335 is literally false.

54. Dyson's claim that the Excel XLERATOR hand dryer consumes more energy than the Dyson Airblade is literally false and disparaging.

55. Dyson's false and disparaging claims, each one and in combination, are material and likely to influence consumers.

10

56. Upon information and belief, Dyson is waging its false and disparaging advertising campaign willfully and with full knowledge of its false and disparaging nature, and of its tendency to deceive.

57. Dyson's advertising violations Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

58. Dyson, through its acts of false advertising and disparagement, has caused irreparable injury to Excel, and unless and until it is restrained, will cause further irreparable harm to Excel.

59. Dyson, through its false advertising and disparagement, has deceived the public and has caused and will continue to cause irreparable injury to the public if Dyson is not restrained by this Court.

60. No monetary remedy would be adequate to compensate Excel for all of the injury that Dyson's wrongful acts have caused to Excel's reputation, goodwill and sales and for injury Excel would suffer should those acts not immediately cease.

61. Unless Dyson is enjoined, Excel will suffer monetary damage as a result of Dyson's wrongful acts in an amount dependent upon how quickly Dyson's wrongful acts are stopped, and the extent of the remedial advertising campaign ordered by the Court.

## COUNT II – MASSACHUSETTS FALSE ADVERTISING – VIOLATION OF CHAPTER 93A

62. The Plaintiff repeats and realleges the allegations contained in paragraphs 1-61 of its Complaint and incorporate them herein by reference.

63. Dyson's conduct described above constitutes false advertising and disparagement in knowing and willful violation of M.G.L. c. 93A.

64. Dyson, through its acts of false advertising and disparagement, has caused irreparable injury to Excel and unless or until it is restrained, it will cause further irreparable injury to Excel.

65. No monetary remedy would be adequate to compensate Excel for the injury that Dyson's wrongful acts have caused Excel's reputation, goodwill and sales and for the injury that Excel would suffer should those acts no immediately cease.

66. Unless Dyson is enjoined, Excel will suffer monetary damages as a result of Dyson's wrongful acts in an amount dependent on how quickly Dyson's wrongful act are enjoined, and the extent of the remedial advertising campaign ordered by this court.

## COUNT III – FEDERAL TRADEMARK DILUTION PURSUANT TO 15 U.S.C. §1125(c)

67. The Plaintiff repeats and realleges the allegations contained in paragraphs 1-66 of its Complaint and incorporate them herein by reference.

68. Excel's trademarks, trade dress and brand are famous and distinctive.

69. Dyson's actions in using Excel's famous and distinctive trademarks in association with false and misleading performance parity claims, and making disparaging comments about the Excel brand and trademarks have diluted, continued to dilute and/or are likely to cause dilution of Excel's trademarks.

70. Dyson's actions described above constitute violations of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

71. On information and belief, Dyson's actions in violating Excel's rights were willful.

72. No monetary remedy would be adequate to compensate Excel for all of the injury that Dyson's wrongful acts have caused to Excel's reputation, goodwill and sales and for the injury Excel would suffer should those acts not immediately cease.

73. Unless Dyson is enjoined, Excel will suffer monetary damages as a result of Dyson's wrongful acts in an amount dependent upon how quickly Dyson's wrongful acts are stopped.

## COUNT IV – VIOLATION OF M.G.L. c. 266, §91

74. The Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 of its Complaint and incorporate them herein by reference.

75. Through the conduct described above, Dyson made statements which were untrue and misleading in advertising.

76. As a result of such untrue and misleading statements in advertising, Excel has been injured.

77. The statements made by Dyson in its advertising were untrue, deceptive and/or misleading.

78. Dyson knew or might, on reasonable investigation, have ascertained, that the statements about Excel were untrue, deceptive and/or misleading.

79. Dyson, through its acts and statements described above, has deceived the public and has caused and will continue to cause irreparable injury to the public and Excel if it is not restrained by this Court.

80. No monetary remedy would be adequate to compensate Excel for all of the injury Dyson's wrongful acts and statements have caused to Excel's reputation, goodwill and sales and for the injury that Excel would suffer should those acts not immediately cease.

## PRAYER FOR RELIEF

WHEREFORE, Excel respectfully requests the following remedies and relief:

1.      A temporary restraining order immediately enjoining Dyson from any further dissemination of any advertisement or promotional material containing any false or disparaging claims concerning Excel's XLERATOR

2.      A preliminary and permanent injunction restraining Dyson from distributing, disseminating, entering into or performing any agreement for the printing or broadcast of, or otherwise carrying on, the advertising campaign based on the MSL Study.

3.      An order that corrective advertising be published to correct the false and disparaging messages already communicated to the public regarding $CO_2$ emissions of the Excel XLERATOR hand dryer, drying times for the Excel XLERATOR hand dryer, and costs to run the Excel XLERATOR hand dryer.

4.      Judgment on Count I directing an accounting by Dyson of its profits by reason of its false advertising and disparagement.

5.      Judgment on Count I awarding Excel its damages arising out of the described false advertising and disparagement and trebling of Excel's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117, as a result of Dyson's willful and intentional violations.

6.      Judgment on Count II awarding Excel its damages arising out of Dyson's false advertising and disparagement.

7.      Judgment awarding Excel its reasonable attorney's fees and costs in this action, pursuant to 15 U.S.C. §1117 and Mass. Gen. L. c. 93A.

8.      Judgment on Count III awarding Excel its damages arising out of Dyson's false advertising and disparagement.

9.      Judgment on Count III directing an accounting by Dyson of its profits by reason of its false advertising and disparagement.

10.     Judgment on Count III awarding Excel its damages arising out of Dyson's dilution of Excel's trademarks and trebling Excel's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117 as a result of Dyson's willful and intentional violations.

11.     Judgment on Count IV against Dyson.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

THE PLAINTIFF,
EXCEL DRYER, INC.

Date: _12/5/12_

By _____
Patrick J. O'Shea, Esq.
Patrick J. Markey, Esq, both of.
O'Shea Getz P.C.
1500 Main Street, Suite 912
Springfield, Massachusetts 01115
Phone (413) 731-3100
Fax (413) 731-3101
PJO BBO No.: 564832
PJM BBO No.: 563542

## VERIFICATION

I, Denis Gagnon, have read the foregoing Complaint and, on my oath, affirm that the allegations contained therein are true and accurate to the best of my personal knowledge.

_____
Denis Gagnon, President
Excel Dryer, Inc.

15