UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EXCEL DRYER, INC., )<br>)<br>Plaintiff )<br>)<br>)<br>v. )<br>)<br>)<br>DYSON, INC., )<br>)<br>Defendant )<br>) | Civil Action No. 12-30211-MAP |

MEMORANDUM AND ORDER WITH REGARD TO DYSON,
INC.'S MOTION FOR A PROTECTIVE ORDER
(Document No. 124)
February 4, 2014

NEIMAN, U.S.M.J.

Presently before the court is Dyson Inc.("Dyson")'s motion for a protective order, which motion has been opposed by Excel Dryer, Inc ("Excel"). A hearing on the motion was held on January 15, 2014. In essence, Dyson seeks to preclude Excel from "obtaining highly confidential and competitively sensitive information concerning the testing, research and development of Dyson products which are not at issue in this litigation." In particular, Dyson seeks to (1) limit the scope -- to Dyson Airblade AB 02/04 models only -- of a subpoena *duces tecum* served on NSF International ("NSF") by Excel, (2) preclude Excel from deposing Patrick Davison, a former employee of NSF, about products other than the AB 02/04 models, and (3) limit the scope of Excel's future discovery requests from other third parties to only the AB 02/04 models.

For the reasons which follow, the court will allow Dyson's motion in part and deny

it in part. The court, however, will not address the third part of Dyson's motion which seeks to limit discovery which may be pursued by Excel from yet other third parties. If the instant ruling does not provide sufficient overall guidance with respect to the limits on such future discovery, any unresolved dispute with respect to third parties will need to be brought to the court's attention via motion.

## I. BACKGROUND

Dyson asserts that the limits it seeks in its motion are appropriate in light of the fact that Excel's lawsuit concerns only the Dyson AB 02/04 models, which were the subject of both Dyson's advertising and a study (a life cycle analysis ("LCA")) by MIT's Material Systems Laboratory. Dyson is concerned that Excel seeks to rummage around proprietary information concerning other models which were not the subject of the advertising Excel challenges here. For example, Dyson asserts, Excel is seeking all documents from NSF related to "Dyson" generally or to "hand dryers." Similarly, Dyson points out, Excel's deposition subpoena to Davison seeks documents related to testing *all* Dyson Airblade models "including but not limited to the 2012 testing of the Airblade 05," a model not part of the challenged advertising. Dyson also maintains that the confidentiality order applicable to this lawsuit would insufficiently address its concerns. (See Document No. 50.)

Excel asserts that Dyson has it all wrong. First, Excel argues that the existing confidentiality order would more than adequately protect Dyson's research and development documents. Second, Excel argues that a central issue in this case is the "independence" of NSF's P335 standard, much touted by Dyson, and the extent to which the authors of the MIT LCA Study relied on NSF's independence. In essence,

Excel asserts, it has the right to discover evidence as to whether NSF acted less than independently with respect to Dyson Airblade products, including but not limited to the AB 02/04 models.

Excel also points out that NSF played no role in researching or developing any of Dyson's products; it merely conducted tests to ascertain whether those products met NSF P335 standards. Discovery to date, Excel maintains, reveals that NSF did not act independently when promulgating the NSF P335 standard or in testing Dyson products. More to the point, perhaps, Excel asserts that MIT's LCA Study, on which Dyson's challenged advertising is based, would not have been published but for the fact that its authors and the critical review panel believed NSF was independent. In essence, Excel asserts, NSF's "entire relationship" with Dyson is in play.

## II. DISCUSSION

The court's task has been complicated by the polar opposite positions taken by the parties. For its part, Dyson seeks to confine Excel's inquires to a particular time period and specific models of its Airblade. Excel, on the other hand, seeks to have practically unfettered discovery of both NSF's documents and third-party witnesses. The court, for its part, has tried to reach a balance between protecting Dyson's proprietary interests while granting Excel the ability to explore, as appropriate, NSF's independence. Unfortunately, given the wide breadth of the parties' dispute, the boundary line between these two interests cannot be drawn with precision. Accordingly, the scope of permissible discovery, as best as can be determined by the court at this time, will be set forth in bold below. If either party believes this guidance falls short in particular instances, it can bring a more targeted dispute to the attention of the court via

3

a further motion.

As an initial matter, the court has little trouble concluding that **Excel should have relatively free range in both pursuing documents from NSF and in deposing Davison on matters concerning the creation of the NSF P335 standard and the Airblade 02/04 from the end of 2005 through 2008, during which time the NSF P335 standard was developed and used in testing the AB 02/04 models.** Excel has presented sufficient information that this was a critical time period. (See, *e.g.*, Declaration of Patrick D. Duplessis at ¶¶ 8 through 22 and Affidavit of David B. Crevier at ¶¶ 5 through 8, together with accompanying exhibits (Document No. 135).) Further, as represented at oral argument, Dyson has no apparent objection to such discovery from NSF and/or Davison for this time period.

In the court's opinion, however, the relevant time period at issue is not quite as cabined as Dyson suggests. While the NSF standard may have been created and applied to the Airblade 02/04 models from 2005 through 2008, there is evidence before the court which indicates (1) that the NSF standard was key to if not discussed during the advertising campaign developed in 2010 through 2012 for the Airblade 02/04 models (see Duplessis Declaration (Document No. 135), Exh. 1 (Thomas Blower deposition) at p. 201), (2) that information about product drying time was exchanged in 2010 (id. at pp. 210-12), and (3) that the first draft of MIT's LCA Study was sent to Dyson in January of 2011, with follow-ups throughout that year and beyond (id. at pp. 214-15, 253, 257, 308). Excel also cites an email authored in August of 2012 by Davison which relates to the creation and application of the NSF P335 standard. (See

Affidavit of David B. Crevier (Document No. 135) at Exh. 5.)  Given this evidence, the court concludes that **Excel should be able to seek appropriate discovery in the form of documents and testimony with respect to the Airblade 02/04 models and revisions to NSF's P335 standard for the post-2008 time period as well, including but not limited to the entire body of emails from Davison regarding the development of the NSF P335 standard and the revision of that standard in 2012.**

The evidence proffered, however, does not convince the court that Excel should be able to freely explore proprietary information with regard to other Dyson Airblade models.  Granted, Excel asserts that it is entitled to discover whether NSF "acted less than independently" with respect to not only the AB 02/04 models but other Airblade products as well.  Excel maintains that "NSF's alleged independence was a critical factor" in the publication of MIT's LCA Study and points to the affidavit of Dyson's Toby Saville in opposition to Excel's Motion for a Preliminary Injunction; that affidavit invoked the independence of NSF a number of times with respect to both the creation of its P335 standard and its testing of products. (See Affidavit (Document No. 26).)  In addition, Excel points out, Dyson alleges in a counterclaim that "[u]sing the *independent* NSF P335 standard of 0.1 grams, the Xlerator fails to achieve complete dryness at 15 seconds in Excel's own testing." (Dyson's Answer to Complaint (Document No. 37) at ¶ 36 (emphasis added).)  Finally, Excel argues that, since NSF played no role in researching and developing these products, there is little chance that Dyson's proprietary information will be revealed should the motion for a protective order be denied.

On closer examination, however, the strength of Excel's arguments begins to fade.  First, the independence of NSF may be at issue, but in the main that issue centers on the creation of the NSF P335 standard and the testing of the Airblade 02/04 models, all of which occurred during the very time period for which Dyson seeks no protection.  Second, NSF's "alleged independence" may have been a critical factor in MIT's LCA Study, but it appears from the evidence before the court that this issue played out between Dyson and MIT, not NSF.  As described by Excel in the Duplessis Declaration (Document No. 135), the only interactions concerning the NSF P335 standard and a related Dyson DTM 769 standard were between Dyson and MIT.  Indeed, practically all the documents which Excel proffers with regard to the "independence" issue bear dates within the critical 2005 through 2008 period.  (See Crevier Affidavit at Exhs. 1 through 3.)

Third, while NSF may have played no role in researching and developing other Dyson Airblade products, models which are not at issue in this litigation, NSF's testing of those products is still proprietary and there is little doubt that the documentary discovery which Excel seeks with regard to these other models would touch on competitively sensitive information.  Indeed, as Dyson point out, Excel itself redacted information from documents it produced based on its characterization of such information as "reflec[ing Excel] discussions of confidential research and development topics having nothing to do with this litigation." (Declaration of Jeffrey N. Warshafsky (Document No. 126), at Exh. 3 (September 19, 2013 letter from Crevier to Warshafsky).)  Fourth and finally, it is not clear how Excel ties its invocation of NSF's "independence" to the documents it seeks from NSF, other than to be permitted to

obtain unfettered access to NSF's files.  Aside from the fact that such broad access is not supported by the evidence proffered by Excel, it could, if permitted, run up against the proprietary information which Dyson has raised.

That said, the court nonetheless believes that **NSF's "independence" may be questioned in a more narrow regard via depositions; depositions, in the court's opinion, provide a more appropriate setting to explore NSF independence while, at the same time, guarding against the revelation of proprietary information through the unrestricted production of documents in ways otherwise suggested by the proffered documents.**  Should the parties not be able to hew to this line, they may bring more targeted disputes to the attention of the court.

For example, Excel suggests that the Airblade 05 model initially failed to pass the NSF P335 test in 2012 but that NSF thereafter certified the product as having passed the standard.  (See Crevier Affidavit at ¶ 9 and Exhibit 4.)  This can best be addressed through depositions, including Davison's to the extent he has relevant information; NSF's "independence" with regard to the AB 05 may be reflective of its independence with regard to the Airblade 02/04.  In addition, as to Excel's deposition of Davison, it need not be limited to the 2005 through 2008 time period given the August 2012 email cited above; as described, the deposition could explain information he has with regard to the NSF P335 standard and its later revision.  Otherwise, Excel's inquiries of him shall be limited to the Airblade 02/04 models.

### III. CONCLUSION

For the foregoing reasons, the court ALLOWS Dyson's motion with respect to the

subpoena *duces tecum* served on NSF by Excel and the deposition subpoena served on Davison by Excel, EXCEPT as to the permitted discovery set forth above in bold. For the reasons previously explained, however, Dyson's motion is DENIED without prejudice to the extent it seeks to limit Excel's discovery requests of other third-parties.

SO ORDERED.

February 4, 2014

                                            /s/   Kenneth P. Neiman
                                            KENNETH P. NEIMAN
                                            U.S. Magistrate Judge